## THE TWO MARYS.

*(District Court, S. D. New York. March 6, 1882.)*

1. ADMIRALTY—LIEN OF SHIPWRIGHT FOR REPAIRS.

     A shipwright has a common-law lien for the amount of his repairs upon a vessel taken to his yard and put upon the ways for such purpose, though the mate in the employ of the owner remain about her and sleep aboard.

2. SAME—REPAIRS—LIABILITY OF PART OWNER.

     Such a lien, without regard to the absolute necessity of the repairs, is legal to the extent of the interests of the part owners of the vessel in possession who directed such repairs to be made, though not binding upon a part owner who gives express notice of his dissent to the repairs.

3. SAME—RIGHT OF POSSESSION.

     The shipwright in such a case has the same common-law right to maintain his possession that the part owners had who employed him.

4. RIGHTS OF PART OWNERS DISSENTING.

     If the repairs be necessary, whether the share of the part owner who expressly dissents be bound or not, he cannot derive any benefit from the subsequent use of the vessel without allowance for the repairs.

**5. COMMON-LAW LIEN PROTECTED.**

The common-law lien of a shipwright in possession is recognized and protected in admiralty where the vessel is seized under process of the court in other proceedings.

**6. CASE STATED.**

Where H., a shipwright, made repairs upon a vessel in his yard beyond what was necessary, and enlarged her at the request of the owners of seven-eighths, but with notice of dissent from the other part owner; launched her in course of the work; retained her in the stream adjacent to his yard; worked upon her daily until three days prior to the time when she was seized by the marshal under process of this court upon a libel by another for supplies, and the vessel was still unfinished in her forecastle and her center-board not being in, but in the shipwright's yard; and the mate in the employ of the owner had continued on the vessel from the time she was taken for repairs to the ship-yard until she was seized by the marshal, sleeping on board; and the captain with his son, after she was launched, having been more or less aboard with the shipwright's assent, though forbidden to interfere; and the marshal, upon coming to arrest the vessel, being forbidden by H. on the ground that she was in his possession: *Held*, that the presence of the mate, and also of the captain upon sufferance, were not sufficient evidence of any surrender of the vessel by H.; that the vessel continued in his possession in the stream, as upon shore, at the time when she was seized by the marshal; and that H. was therefore entitled to intervene as a claimant for the protection of his interest as against the shares of those who employed him.

Hearing on Exceptions to Intervenor's Claim.

*H. B. Kinghorn* and *R. D. Benedict*, for libellant.

*Scudder & Carter* and *G. A. Black*, for Hawkins, lienor.

BROWN, D. J. This hearing arises upon the report of the clerk, to whom it was referred on December 23, 1879, to take such testimony as might be offered concerning the interest of John P. Hawkins in the schooner Two Marys, and his right to appear as claimant. The claim of Hawkins was filed September 22, 1879, and averred that he was in possession of the schooner at the time she was seized by the marshal on September 17th; that he had been repairing and reconstructing her; that his work was not completed, and the sum of $5,000 was due him. Libellant filed exceptive allegations to this claim, averring that Hawkins had no lien, was not in possession, had surrendered and abandoned her, that nothing was owing him, and that he had no interest in the vessel.

At the time of seizure, Hawkins, and Crowley, the master, each claim to have been in possession. On the twenty-second of September, Hawkins, as claimant, gave a bond for libellant's claim under the act of 1847, and the usual order for the release of the vessel was given on that day, and Hawkins received from the marshal a notice to the keeper for the discharge of the vessel. On going aboard he found Crowley already there. A controversy arose, the result of

which was that Hawkins was taken away under arrest by a police officer. The keeper of the marshal left the vessel with Crowley aboard.

Upon a subsequent hearing before this court the marshal was ordered to retake possession, on the ground that the process had not been properly executed, (see 10 Ben.) and a reference was ordered to inquire into Hawkins' interest as above stated. Subsequently, on February 12, 1880, Crowley, who was the owner of one-sixteenth and intervened as claimant, gave a bond in the sum of $7,000 to Hawkins for the safe return of the vessel, and was allowed by the court thereupon to receive possession from the marshal. Before the present hearing Crowley died, and subsequent proceedings were had, upon notice to his administratrix and the stipulators on his bond.

The libel was filed on the twenty-fifth of January, 1879, for supplies and materials furnished to the schooner in this, her home port. She was at that time in the ship-yard of Hawkins, undergoing repairs. The process was served upon the vessel and upon Hawkins, but possession was not taken by the marshal. The libellant was at that time owner of five-sixteenths, and the object of filing the libel was shown to be to facilitate his acquiring the interests of the other owners who had dissented to the repairs which the libellant had ordered to be made, and which were then going on in Hawkins' ship-yard; while Crowley, the owner of one-sixteenth, was acting in concert with the libellant. Shortly after the libel was filed, the libellant obtained a transfer of the interests of all the other owners for a small sum, except that of one Wheaton, of Philadelphia, the owner of one-sixteenth, who had also protested against the repairs, and who has not intervened in this suit. Hawkins was notified of the intention of McLean to file a libel, and of his purpose in doing so,—to facilitate the completion of the repairs and of rebuilding, as desired. The work was substantially proceeded with by Hawkins, at the libellant's request, and the vessel launched on August 27th. Her seizure by the marshal on the sixteenth of September was made without prior notice to Hawkins, while some work still remained to be done upon her, and seems to have been designed as a means of cutting off any claim of Hawkins to the possession of her. There was no other person asserting any opposing claim. It is upwards of three years since the action was commenced, and there is no other controversy than that with Hawkins.

The reference and the testimony on it involve substantially all the merits upon Hawkins' side of the case, and a large mass of testimony

has been taken. On behalf of the libellant it is claimed (1) that Hawkins never had any lien upon the vessel; (2) that if he ever had such a lien it was lost by surrendering the vessel before the seizure by the marshal on the sixteenth of September.

1. The lien claimed is simply that of a common-law possessory lien by Hawkins, the shipwright, for repairs while in his possession. The libellant contends that he never acquired any common-law lien, for the reason that he was notified by several of the owners, before proceeding with the work, that they protested against the proposed repairs; that, consequently, neither such owners nor their property could be made liable for repairs made against their consent; that no lien could, therefore, bind their interest in the schooner; that there could be no common-law lien upon the interests of part owners only; and that under such circumstances the repairs must be presumed to have been made upon the personal credit of those who ordered them. It is also contended that Hawkins never had such exclusive possession as would sustain a common-law lien.

The vessel was sent by the libellant, about December 1, 1878, to Hawkins' ship-yard at City Island to be repaired, with directions to make first a preliminary examination to ascertain how much repair was necessary. The schooner was hauled on the ways and found to be in need of greater repairs than were anticipated. In February, 1879, after the libellant had acquired almost the entire interest in the vessel, it was determined to substantially rebuild her. Captain Crowley accompanied the vessel to the yard, and remained with her a few days. The mate, Lawrence, in the employ of the libellant, remained with her while the repairs were going on, down to the time of her seizure by the marshal. He slept in the cabin until it was removed in the course of the repairs, and then continued to sleep in it, near by, until he was again put aboard the vessel. His meals were furnished by the libellant. He did such work as was assigned to him by Hawkins upon the schooner, as well as some odd jobs upon other vessels. The work of doing the repairs and rebuilding was under the exclusive management and control of Hawkins. While this was going on, the vessel, in my judgment, must be deemed to have been in the possession of Hawkins sufficient to sustain a common-law possessory lien. The presence of the mate during these repairs, in the pay of the libellant, whether as seaman or assistant, or for any other purpose, in looking after the interest of the libellant, was in no way incompatible with Hawkins' control of the work upon the vessel while in his yard undergoing repairs, or his possession for

that purpose; and the same possession is sufficient for a common-law lien. *The Schooner Marion*, 1 Story, 68, 75.

I do not think it requisite to determine in this case whether necessary repairs upon a domestic vessel in her home port can be made a lien or charge upon her as against the individual interest of an owner who gives express notice of dissent to the shipwright. Part owners of vessels are, for the most part, regarded as tenants in common of other chattels are regarded, neither of whom, at common law, can bind the others, or the others' interest in the property, except through their consent, expressed or implied. It seems to be settled that a part owner of a vessel who has not authorized repairs is not personally liable for any part of the expense incurred therefor by the direction of the other part owners. *Stedman* v. *Fiedler*, 20 N. Y. 437; *Brodie* v. *Howard*, 17 C. B. 109. The common law affords no remedy to one tenant in common of a single indivisible chattel against another part owner who retains it to his own exclusive use. *Russell* v. *Allen*, 13 N. Y. 173; *Gilbert* v. *Dickerson*, 7 Wend. 449. He is, therefore, not liable for any part of the expense of keeping and repairing it while in the possession and use of the other part owner; nor does the latter have any lien for his charges and expenses. 1 Pars. Shipp. & Adm. 115. Only in case of a destruction of the property or a sale or secret removal of it by one part owner, the other may, at his option, recover in trover the value of his interest as for a conversion; or, at his election, he may treat the vendee as only a co-tenant with himself, and retake and use the property himself, if he can get it, with equal exemption from any liability to account for its use. *Wilson* v. *Reed*, 3 Johns. 175; *Hyde* v. *Stone*, 9 Cow. 230; *White* v. *Osborne*, 21 Wend. 72; *Fiero* v. *Betts*, 2 Barb. 633; *Tyler* v. *Taylor*, 8 Barb. 585; *Dain* v. *Cowing*, 22 Me. 347.

These rude and semi-barbarous incidents of the common law in regard to co-tenants of chattels have necessarily been much modified to meet the exigencies of commerce and the equitable rights of part owners of vessels. A managing owner, or a ship's husband, has a general implied authority to bind all the owners for necessary repairs, unless the party dealing with them have notice of dissent, (Story, Ag. § 40;) and in this country it may be deemed settled that necessary repairs or supplies furnished on the order of any one part owner will be deemed to have been furnished upon the implied authority of all the part owners, and all will be bound therefor, unless express dissent is proved, (3 Kent, Comm. *155; *McCready* v. *Thorn*,

51 N. Y. 454; 1 Pars. Shipp. & Adm. 101;) and any circumstances which can be seized upon as importing or involving any ratification by the other owners of the work or supplies previously furnished upon the order of one, will also make the others liable; such as participating in subsequent profits of the voyage, or taking a bond for the return of the vessel in an amount including the value of the repairs, (*Davis* v. *Johnson*, 4 Sim. 539, 543;) otherwise, if the amount of the bond does not include such repairs, (*Brodie* v. *Howard*, 17 C. B. 109.)

If repairs are absolutely necessary to a voyage the majority in interest may cause them to be made; and if the other owners dissent, they cannot share in the future earnings of the ship without allowing for the expense of the repairs, although their value is not exhausted in the voyage. *Green* v. *Briggs*, 6 Hare, 395; Maclac. Shipp. 105. Thus, except in case of the loss of the vessel, dissentient part owners are practically compelled ultimately either to contribute to necessary repairs or else to abandon their interest in the *use* of the vessel to the other part owners.

There is no question, however, that the implied authority to bind other part owners does not extend beyond necessary and reasonable repairs, (1 Pars. Shipp. & Adm. 100;) and in this case the lengthening and substantial rebuilding of the Two Marys was in excess of any authority which could be implied as against other owners even in a ship's husband or master, or a managing owner; and as Wheaton, the owner of one-sixteenth, gave written notice of his dissent to the repairs, which I think is sufficiently proved to have come to Hawkins' knowledge, and as that dissent has never been waived, and the repairs were beyond the limit of any reasonable necessity, Wheaton's interest cannot be here considered as in any manner bound by Hawkins' claim.

But I do not perceive anything either incongruous in itself, or impracticable in its results, in holding that a common-law lien might be created upon the shares of the libellant and Crowley, the owners of fifteen-sixteenths, who authorized the repairs to be made. As they might sell their interests separately and deliver possession of the vessel, so they might equally create any charge upon their interests recognizable by law. They could mortgage their shares and deliver possession to the mortgagee; and they might employ Hawkins to repair, and deliver possession of the vessel to him for that purpose in the ordinary way, so as to create a lien valid in my judgment against

their own shares, at least, if their authority extended no further. In doing so they would give Hawkins the same possessory rights which they themselves had, and no more; and they would thereby authorize the court, through the medium of any appropriate legal proceedings, to make as effective a sale of their own shares for the purpose of satisfying the lien as they themselves might have made directly. The point was involved, though not discussed, in the case of *The Mary E. Perew*, 15 Blatchf. 58. Although a mere common-law lien is a right of detention only, and does not admit of any enforcement by means of a private sale, or by a suit in equity for that purpose, (Maclac. Shipp. 7; *Thames Iron-works, etc.*, v. *Patent Derrick Co.* 1 J. & H. 93; *Terrell* v. *Schooner B. F. Woolsey*, 4 Fed. Rep. 552, 558,) yet it has been held enforceable under the general powers of a court of admiralty, as well as under the enlarged remedy designed to be afforded under the statute of this state passed May 8, 1869, (Laws of N. Y. 1869, c. 738, p. 1785.) *The Marion*, 1 Story, 68; *The Bark Archer*, 9 Ben. 455; *The B. F. Woolsey*, 7 Fed. Rep. 108, 116.

But even if it were otherwise, and if Hawkins had no means of enforcing his possessory lien by sale through a suit in admiralty, that would not prevent his intervention as a lienor upon such a lien on a libel filed by another upon which the marshal had under process taken the vessel from his possession. Such possession, if lawfully held by Hawkins at the time the vessel was arrested by the marshal, this court, in enforcing the rights of the libellant, is bound to respect, by admitting him to present his claim and have it paid, if he shall be found legally entitled to payment, to the extent of the value of his employers' shares; just as it would do in the case of a mortgagee of one or more shares, who, though he could not directly sue in admiralty, would be admitted, nevertheless, to intervene and set up his claim upon the *res* when it was libelled at the suit of another. *The Jenny Lind*, 3 Blatchf. 513; *The Island City*, 1 Low. 375, 379; *The Gustaf*, 1 Lush. 506; *The Old Concord*, 1 Brown, Adm. 270; *The St. Joseph*, Id. 202; *The Brig Wexford*, 7 Fed. Rep. 674, 684.

There is nothing in the nature of the contract between the libellant and Hawkins incompatible with the ordinary lien of a mechanic for the work done by him. There was no agreement that Hawkins should be paid in goods exclusively, although it is true that mutual dealings and credits between them arose to a considerable extent. In several of the libellant's letters, where payment in money is re-

ferred to, there is no claim that Hawkins was not entitled to money, or that he was to take his pay in goods. The passages in the testimony referring to Hawkins' statements that he was doing the work on the credit of McLean, evidently refer only to the person from whom he would take his orders and directions concerning the repairs to be made on the vessel; they were obviously not made with reference to any question of lien, nor were they designed to express any waiver of whatever lien the law might give him. McLean testifies that nothing was ever said between them upon the subject of a lien. Unless something is said or done incompatible with it a lien exists as a matter of course; it is the ordinary right of the mechanic; and it existed in this case upon McLean's interest, unless the vessel was voluntarily surrendered and the lien thereby waived.

The burden of proof is undoubtedly upon the libellant to show that Hawkins waived his lien. Every presumption is to the contrary. To divest his lien, in the language of Judge Story, (*The Marion,* 1 Story, 76,) incontestible proof of an intention to surrender the vessel to the owners must appear, through the language or the acts of one or both of the parties, plainly incompatible with the continuance of the lien. I am not satisfied that the evidence in this case shows any such intended surrender or waiver by Hawkins, or that the libellant or Capt. Crowley ever so understood.

I have already stated that Hawkins' possession of the vessel, while she was in his yard undergoing repairs, was a sufficient possession to found a claim of lien upon, notwithstanding the presence of Lawrence, the mate, in the pay of McLean, and the occasional presence of Capt. Crowley. The vessel was launched on the twenty-sixth of August. McLean, Capt. Crowley, and various other persons were aboard at the time, and participated in the festivities of the occasion. It cannot be seriously claimed that this amounted to any surrender of the vessel. The launch was the ordinary incident of that stage of the work. The work was unfinished, and was continued daily by Hawkins until the thirteenth of September. Upon being launched she was moored at a dock adjacent to the ship-yard which Hawkins had the use of. He slept in her that night. The next day, fearing a storm, in order to prevent her from chafing at the dock, he ordered her to be hauled out into the stream, where she lay until the sixteenth of September, when she was arrested and carried away by the marshal. She was still incomplete; her center-board was not in, nor her forecastle fin-

ished. During this time Lawrence usually slept on board the schooner as she lay in the stream, as he had done when she was on the ways. Capt. Crowley and his son were also more or less aboard. On several occasions, however, when Capt. Crowley had undertaken some interference, he had been ordered by Hawkins to desist, and he was forbidden to go aboard the vessel if he undertook any interference. Crowley swears that after she was launched Hawkins put her in his possession. Hawkins denies it; he swears that he never surrendered her. Hawkins' account of the matter is, I think, clearly sustained by the letter of McLean, written September 10, 1879, in which he says: "Please be sure and bring her [the schooner] down to-day or to-morrow, and bring your bill with you. It is too bad to keep her lying still now. You need not be afraid of your money; you can have security for every dollar that is due you." This letter, written two weeks after the launch, with the urgent request to bring the vessel down to the city, with his bill, and the assurance that Hawkins would have security for every dollar that was due him, furnishes to my mind conclusive evidence that the parties all understood that the vessel was still in Hawkins' possession and under his control, as much so as when lying on the ways in his yard; and that they knew that Hawkins looked to the possession of her as a security for his claim. Except for this, there was no reason why McLean should assure him that he should have security upon bringing the vessel down. Nor even aside from his letter should I be disposed to hold that Hawkins' possessory lien was lost at the time of the seizure by the marshal. The vessel lay in the stream, immediately adjacent to his yard. She was placed there by his direction in the ordinary course of completing the repairs which he was employed to make; the repairs were not completed, and Lawrence's presence was not different from his presence at the yard; and the presence of Capt. Crowley and his son, more or less, was evidently by the sufferance of Hawkins only, and with no intention of surrendering the vessel to their control, or waiving his possessory rights. His possession was a continuance of that which he had previously held in the yard, for the purpose of completing the work upon which he was engaged. The presence of the other persons on board was not incompatible with it, and therefore did not change or determine Hawkins' previous possession, unless it were so understood and intended. That McLean did not so understand is plain from his letter above quoted. When

the marshal came to arrest her, Hawkins forbade the arrest, claiming to be in possession. In truth, no reason whatever appears for the sudden issuing of this new process to arrest the vessel upon the old libel, filed nearly eight months before, except to wrest her by force from the known possession of Hawkins, after he had failed to bring her to the city as requested, six days before, upon McLean's promise to give security for his payment. Had this offer of security been made in good faith it seems hardly probable that a litigation of two years and a half would have arisen upon the mere question of Hawkins' right to intervene and present his claim to the court, without any endeavor, in the mean time, even to adjust their accounts.

Upon the whole evidence I am of opinion that Hawkins, at the time of the arrest of the vessel, had such a possessory lien as should be recognized and protected in admiralty; that it had not been waived, and that he must therefore be admitted to intervene as a claimant; and the exceptions are therefore overruled.

See *The De Smet, ante,* 483, and note.